IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | DR-13-CR-1359(3)-DAE |
| | ) | |
| vs. | ) | |
| | ) | |
| SAMMY SALAZAR, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

Before the Court is a Motion to Supress all evidence and statements obtained after a traffic stop on Texas Highway 131 filed by Defendant Sammy Salazar ("Defendant").  (Dkt. # 52.)  The Government filed a response.  (Dkt. # 60.)  On January 23, 2014, Defendant filed a Supplement to his Motion to Suppress.  (Dkt. # 73.)  The Court heard argument on January 28, 2014.  Assistant United States Attorney Timothy A. Duree, Esq., appeared at the hearing on behalf of the United States ("the Government"); Elizabeth A. O'Connell, Esq., appeared at the hearing on behalf of Defendant.  Upon careful consideration of the supporting and opposing memoranda and the arguments and testimony at the hearing, as well as the evaluation of the credibility of the witnesses, the Court **DENIES** Defendant's Motion to Suppress.

1

<u>BACKGROUND</u>

On September 24, 2013, Customs and Border Protection Officers set up a temporary "tactical immigration checkpoint" along Texas Highway 131 just south of Spofford, Texas.[1]  At approximately 9:30 a.m., a Lexus sedan approached the checkpoint.  There were three occupants in the vehicle, including the Defendant, in the front passenger seat.

Border Patrol Agents Cary Kuykendall and Caleb Sullivan were working as primary and secondary agents at the tactical checkpoint.  Agent Kuykendall asked the occupants of the Lexus whether they were U.S. citizens and where they were headed.  All occupants claimed to be U.S. citizens and indicated that they were traveling from Eagle Pass to Uvalde to perform construction work. The agents doubted the travelers' story due to several factors: (1) the occupants were not wearing clothes suitable for doing construction work, but rather "street clothes," (2) Highway 131 was a circuitous route from Eagle Pass to Uvalde and takes substantially longer than using Highways 57 and 83, (3) the use of Highway 131 avoids the permanent Border Patrol checkpoint located near Eagle Pass on Highway 57, and (4) Highway 131 is a well-known and popular smuggling

---

[1] This "tactical immigration checkpoint" was a temporary checkpoint.  According to the testimony of Border Patrol Agents Sullivan and Kuykendall, Highway 131 (where the tactical immigration checkpoint was set up) is a well-established route used to circumvent permanent U.S. Border Patrol immigration checkpoints along major highways.

corridor.

Nonetheless, the agents decided to let the vehicle pass and, as the Lexus drove away, a Chevrolet pickup truck entered the checkpoint. There were three immediately visible occupants in the truck—a driver, a female passenger, and a juvenile. The agents asked the occupants whether they were U.S. citizens and where they were headed. The driver responded that he was a U.S. citizen and they were traveling from Eagle Pass to Uvalde for work. The female and the child did not respond to the agent's questions. The agents then noticed individuals lying down and covered in the back of the truck and ordered the driver, Bobbie Lopez, out of the vehicle. An inspection of the vehicle and its occupants revealed that Lopez was the only U.S. citizen in the truck, and the remaining eleven occupants were all non-U.S. citizens illegally present in the United States.

The agents recalled that the occupants of the Lexus, which had just left the checkpoint, had used essentially the same story as Lopez. Believing that the Lexus was acting as a possible scout vehicle for the truck, Agent Sullivan left the checkpoint to catch up to the Lexus. He began driving north on Highway 131 and while driving, passed the turn off to Highway 1572—the road that provides the most direct route between Highway 131 and Uvalde. He noted that when he approached the Lexus on Highway 131, it was driving at an abnormally slow speed, well below the marked speed limit of sixty-five miles-per-hour on Highway

3

131.  Additionally, because the Lexus did not turn onto Highway 1572, he further believed that the driver had lied at the checkpoint about his destination.   While following the vehicle, he radioed in the license plate number of the Lexus and was informed that the vehicle belonged to a female in New Braunfels, which is located in central Texas, North of San Antonio.  However, all three occupants of the Lexus were male and had not mentioned New Braunfels to the agents during the stop at the checkpoint.

At this point, Agent Sullivan turned on his emergency lights and signaled for the Lexus to pull over.  Shortly thereafter, the Lexus came to a stop on the side of the highway.  The Agent testified that it took him relatively little time to catch up to the Lexus, indicating that the Lexus had been driving well below the posted speed limit for some time and giving the Agent reason to believe the Lexus was waiting for the pickup truck to catch up.  The occupants of the Lexus were detained by and Defendant was driven to the Bracketville Border Patrol Station for questioning.[2]  At the station, Homeland Security Investigations ("HSI") Agents Anthony Diez and Orlando Vara arrived and read Defendant his rights.  Defendant signed twice, once indicating he understood his rights and once indicating that he

---

[2] Defendant does not challenge the agents' actions after the stop and prior to his interrogation at the border patrol station.

waived those rights.  He then provided incriminating statements to agents.[3]  He now seeks to suppress those statements.

DISCUSSION

In his Motion to Suppress, Defendant challenges the stop, arguing that the Border Patrol agents illegally seized him when they stopped his vehicle without reasonable suspicion to believe that illegal activity was afoot.  He asserts that all evidence and all statements obtained as a result of the stop must be suppressed as the fruit of a poisonous tree.  In a Supplement to his Motion to Suppress, filed a few days before the hearing, he also challenges the statements given to agents as a violation of his constitutional right to counsel.

At the hearing, the Government called four witnesses: Border Patrol Agents Cary Kuykendall and Caleb Sullivan, and HSI Special Agents Anthony Diez and Orlando Vara.  Agent Kuykendall was the primary agent at the tactical checkpoint on the date of Defendant's arrest.  Agent Sullivan was the secondary agent at the tactical checkpoint and was the agent who pursued and ultimately stopped the Lexus after the discovery of the allegedly illegal occupants in the Chevrolet truck.  Special Agent Diez was the interrogating agent at the Border Patrol station after Defendant was arrested and brought to the station for

---

[3] At the hearing, however, Defendant testified that he did not make any incriminating statements to the agents and that he did not admit to any portion of the crime.  He also testified that he had requested to speak to a lawyer on several occasions during the interview.

5

questioning.  Special Agent Vara assisted in the interview of Defendant.

Defendant testified to the events that occurred during his interrogation with Agents Diez and Vara.

I.      The Border Patrol Agents Had Reasonable Suspicion to Conduct the Stop

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S.  Const. amend. IV.  Traffic stops—including traffic stops for immigration inspections—are considered seizures within the meaning of the Fourth Amendment.  United States v. Brignoni-Ponce, 422 U.S. 873, 882–84 (1975).  "To temporarily detain a vehicle for investigatory purposes, a Border Patrol Agent on roving patrol[4] must be aware of 'specific articulable facts' together with [a] rational inference from those facts, that warrant a reasonable suspicion that the vehicle is involved in illegal activities, such as transporting undocumented immigrants."  United States v. Garza, 727 F.3d 436, 440 (5th Cir. 2013) (quoting United States v. Chavez–Chavez, 205 F.3d 145, 147 (5th Cir. 2000)).  Reasonable suspicion "requires more than merely an unparticularized hunch, but considerably less than proof of wrongdoing by a preponderance of the evidence."  Id. (quoting United States v. Gonzalez, 190 F.3d

---

[4] Although the agents initially encountered the vehicle at a checkpoint, the stop was made later after agents pursued the vehicle.  Neither party contests that the law applicable to the case pertains to roving border patrol stops as opposed to checkpoint stops.

668, 671 (5th Cir. 1999)).

When deciding whether to make an investigatory stop, the Supreme Court in Brignoni-Ponce announced several factors relevant for reasonable suspicion, including: (1) proximity to the border; (2) the characteristics of the area where the vehicle was encountered; (3) the unusual traffic pattern on the road; (4) the arresting agents' previous experience with criminal activity; (5) information about recent criminal activity in the area; (6) the driver's behavior; (7) the appearance of the vehicle, including the vehicle type and whether the vehicle appears loaded; and (8) the number, appearance, and behavior of the passengers. 422 U.S. at 884–85. "No single factor is determinative; the totality of the particular circumstances must govern the reasonableness of any stop by roving border patrol officers." United States v. Moreno–Chaparro, 180 F.3d 629, 631–32 (5th Cir. 1998). The Court will, as it must, examine each Brignoni-Ponce factor in turn.

1.    Proximity to the Border

"The first factor, proximity to the border, is a 'paramount factor' in determining reasonable suspicion." United States v. Zapata-Ibarra, 212 F.3d 877, 881 (5th Cir. 2000) (quoting United States v. Orozco, 191 F.3d 578, 581 (5th Cir. 1999)). This factor asks whether agents had "reason to believe that the vehicle has come from the border." United States v. Rodriguez-Rivas, 151 F.3d 377, 380 (5th

Cir. 1998).  Although the Fifth Circuit does not adhere to a bright-line test, "a car traveling more than fifty (50) miles from the border is usually viewed as being too far from the border to support an inference that it originated its journey there." Zapata-Ibarra, 212 F.3d at 881 (quoting United States v. Jones, 149 F.3d 364, 368 (5th Cir. 1998)).  "Anything less than 50 miles therefore implicates the proximity factor."  Garza, 727 F.3d at 441.

        The question is "whether arresting agents could reasonably conclude a particular vehicle originated its journey at the border."  United States v. Nichols, 142 F.3d 857, 866 (5th Cir. 1998) (emphasis added); see also United States v. Jacquinot, 258 F.3d 423, 428 (5th Cir. 2001) ("The proximity element is satisfied, though, if the defendant's car was first observed within 50 miles of the United States/Mexico border, but was stopped more than 50 miles from the border." (citing United States v. Villalobos, 161 F.3d 285, 289 (5th Cir. 1998))).

        Here, Defendant and the other two occupants informed the agents that their journey originated in Eagle Pass, a town located in very close proximity to the U.S.-Mexico border.  Agent Kuykendall testified that the tactical checkpoint was set up approximately twenty miles from the border along Highway 131, a route frequently used by human and narcotics traffickers.  Agent Sullivan testified that he traveled approximately six miles from the tactical checkpoint to reach the Lexus, where he ultimately made the stop.

8

Given that the known distance of the temporary checkpoint from the border was approximately twenty miles from the border and along a road known for smuggling drugs and aliens from the border, the stop occurred only six miles further north from the checkpoint, and that the Defendant admitted to agents that his journey originated in Eagle Pass at the U.S.-Mexico border, the Court finds that the agents could have reasonably concluded that Defendant's vehicle originated from the border.

2.    Known Characteristics of the Area

"It is well established that a road's reputation as a smuggling route adds to the reasonableness of the agents' suspicion." Zapata-Ibarra, 212 F.3d at 881 (quoting United States v. Aldaco, 168 F.3d 148, 151–52 (5th Cir. 1999)). However, it is equally true that "[r]oads near the border carry not only aliens seeking to enter the country illegally, but a large volume of legitimate traffic as well." Brignoni-Ponce, 422 U.S. at 882.

Both Agents Sullivan and Kuykendall testified that Highway 131 is a well-known and popular alien smuggling corridor because it circumvents the permanent checkpoint located on Highway 57.  The vast majority of traffic on the Highway 131, according to the Agents, consists of local ranchers and large pickup trucks, and it is not a heavily trafficked road or thoroughfare.  Highway 131 is a two-lane road with no developed shoulder and both Agents testified that a Lexus, a

9

luxury sedan, is not a commonly seen vehicle on Highway 131.

Clearly, however, Highway 131 is also traversed by law-abiding citizens and sometimes luxury sedans.  In <u>Villalobos</u>, the Fifth Circuit addressed whether officers could gather reasonable suspicion from the characteristics of an area when the defendant argued that he could have been an innocent traveler returning from a legitimate tourist destination.  161 F.3d at 289.  The Fifth Circuit found that "the possibility that Villalobos could have been an innocent traveler did not negate the fact that the area through which he was driving was both very close to the border and heavily traversed with border traffic." <u>Id.</u>

As in <u>Villalobos</u>, while Defendant could have been innocently driving along Highway 131, this does not negate the fact that Defendant was driving in an area known to the agents for the smuggling of illegal aliens and narcotics in a vehicle that is not commonly seen on that road.  Consequently, the known characteristics of the traffic patterns and smuggling use of the Highway 131 corridor weigh in favor of finding reasonable suspicion.

3.   <u>Unusual Traffic Pattern on the Road</u>

Agents Sullivan and Kuykendall testified that the use of Highway 131 to travel from Eagle Pass to Uvalde takes substantially longer that other available, well-known and more direct routes.  Agent Sullivan testified that the use of Highway 131 would take a driver about twice as long to reach Uvalde than the use

10

of Highway 57, on which there is a permanent border patrol checkpoint.[5]

Additionally, Agent Kuykendall testified that if he were to be on Highway 131 heading towards Uvalde (which he asserted was not the route one would typically take), he would take the turnoff onto Highway 1572, which provides a more direct route to Uvalde from Highway 131 than continuing further north towards Bracketville.[6]

Agent Sullivan testified that as he pursued the Lexus on Highway 131, he passed the turnoff for Highway 1572 and a sign indicating the turnoff to go towards Uvalde.  He stated that this increased his suspicion that the occupants of the Lexus were not being truthful about their travel to Uvalde because if the occupants were actually traveling to Uvalde on Highway 131, the use of Highway 1572 would have provided a far more direct route.

Also, as mentioned above, both Agents testified that a Lexus does not fit the description of the usual vehicles on Highway 131 which typically consists of ranch traffic, specifically large pickup trucks.

Therefore, the unusual-traffic-pattern factor weighs in favor of finding

_____

[5] To demonstrate, the Government introduced as exhibits maps of the portion of Southwest Texas highlighting Highway 131 and the location of Eagle Pass, Bracketville, Uvalde, and the surrounding highways in relation to where the stop was made.

[6] The Government also introduced as an exhibit the sign located at the turnoff from Highway 131 on to Highway 1572, which demonstrated the word "Uvalde" with an arrow pointing to turn onto 1572.

reasonable suspicion.

    4.    <u>Agents' Previous Experience with Criminal Activity</u>

An officer's experience contributes to a finding of reasonable suspicion. <u>Zapata-Ibarra</u>, 212 F.3d at 882. The Supreme Court in <u>Brignoni–Ponce</u> recognized the importance of an officer's experience in the field, and the inferences he may reasonably draw from that experience. 422 U.S. at 885. <u>Brignoni-Ponce</u> noted, "In all situations the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling." <u>Id.</u>

Agent Kuykendall, the primary agent at the temporary checkpoint, has been a Border Patrol agent for approximately ten years, with approximately five years spent at the Bracketville Station.[7] He was assigned to the Bracketville Station at the time of the Defendant's arrest. He testified that he was aware that the Highway 131 route was being used to smuggle aliens and narcotics at the time of Defendant's arrest due to its circumvention of permanent checkpoints.

Agent Sullivan, the agent who pursued the Lexus and made the stop, has been a Border Patrol agent for five and one-half years, all of which have been spent at the Brackettville Station. He also testified that he was aware that the Highway 131 route was being used to smuggle aliens and narcotics at the time of

---

[7] The Bracketville station is located in the town of Bracketville, Texas near the intersection of Highway 131 and Highway 90. Agent Sullivan testified he stopped the Lexus just south of the town of Bracketville.

Defendant's arrest.

Accordingly, the Court views the <u>Brignoni-Ponce</u> factors in light of the agents' combined fifteen years experience as Border Patrol agents, and the agents' combined ten years experience as Border Patrol agents in the Brackettville Station area.  <u>See</u> <u>United States v. Chavez-Chavez</u>, 205 F.3d 145, 149 (5th Cir. 2000) (holding that agents who had "developed substantial experience in detaining illegal aliens on [a particular] stretch of highway" was "of considerable importance in evaluating the totality of circumstances").

> 5.    <u>Information about Recent Criminal Activity in the Area</u>

The Chevrolet truck, which entered the checkpoint immediately after the Lexus, was found to contain eleven non-U.S. citizens illegally present in the United States.  The driver of the Chevrolet provided the same story to agents as the Lexus, informing agents that they were traveling from Eagle Pass to Uvalde to perform work.

Agent Sullivan testified that in his experience as a Border Patrol agent, it is common for vehicles smuggling illegal aliens or drugs to have a lookout or scout vehicle that could potentially alert the load vehicle to the presence of law enforcement and therefore avoid apprehension.  Specifically, the vehicles riding in tandem usually travel a few miles apart so the scout vehicle can alert the load vehicle if law enforcement is present.

The Fifth Circuit recognizes the "load car-scout pattern of travel, 'whereby two cars travel together during a smuggling venture with the first car operating primarily as a scout car.'" United States v. Sanchez-Gonzalez, 269 F. A'ppx 344, 347 (5th Cir. 2008) (quoting United States v. Barnard, 553 F.2d 389, 392 (5th Cir. 1977)); see also United States v. Lopez, 911 F.2d 1006, 1009 (5th Cir. 1990) (recognizing that "vehicles . . . traveling in tandem, lead car-load car arrangement, is a circumstance that 'may understandably raise the officer's suspicions" (internal quotations removed)).  "The Court has also stated that when contraband is discovered in the load car, officers have reasonable cause to believe that the scout car was involved in a criminal activity." Sanchez-Gonzalez, 269 F. A'ppx at 347.

Accordingly, the agents' discovery of the load of alleged illegal aliens in the Chevrolet truck, which entered the checkpoint immediately after the Lexus, would understandably raise the agents' suspicions that perhaps the vehicles were traveling together when the occupants of both vehicles provided the same information as to their journey and were traveling that journey on an indirect route which circumvented permanent checkpoints. [8]

---

[8] At the hearing, Defendant attempted to debunk the Government's "scout vehicle" theory by arguing that if the Lexus and the Chevrolet truck were indeed riding in tandem then, theoretically, the Lexus would have notified the truck of the tactical checkpoint and, thus, the truck could have turned around and avoided the agents. However, the agents' testimony indicated that not much time elapsed between the

14

6.    <u>Driver's Behavior</u>

"It is beyond dispute that Border Patrol agents may consider the behavior of a vehicle's driver in determining whether there is reasonable suspicion to stop that vehicle." <u>Nichols</u>, 142 F.3d at 868.  A driver's behavior contributes to an officer's reasonable suspicion.  <u>Brignoni–Ponce</u>, 422 U.S. at 885.  Even a driver's deceleration, though a commonly innocuous response, may be a factor contributing to the reasonable suspicion justifying a stop.  <u>Villalobos</u>, 161 F.3d at 292.

In this case, Agent Sullivan testified that when he caught up to the Lexus, he noticed that the Lexus was traveling very slowly and far below the posted speed limit of sixty-five miles per hour at approximately thirty-five to forty miles per hour.  He believed that the vehicle was moving slowly because the occupants were waiting to see if the Chevrolet truck, which had been right behind the Lexus at the checkpoint, had made it past the checkpoint.

---

arrival and departure of the Lexus from the checkpoint and the arrival of the Chevrolet.  Agent Kuykendall explained that when the Lexus entered the checkpoint, he had asked all occupants whether they were citizens of the United States.  He stated that he also had asked the occupants where they were going. After this brief questioning, Agent Kuykendall released the Lexus.  Agent Sullivan testified that the Chevrolet truck pulled into the checkpoint as the Lexus was leaving.  Accordingly, the limited lapse of time between the arrival and departure of the Lexus and the arrival of the Chevrolet truck immediately after indicates that perhaps the vehicles were not traveling with enough distance in between them to give a proper warning.  Further, had the Chevrolet truck attempted to turn around within sight of the checkpoint it would have raised substantial suspicion.

Further, Agent Sullivan testified that approximately fifteen minutes had elapsed between the time the Lexus left the checkpoint and the time that he caught up to the Lexus on Highway 131.  Because Agent Sullivan caught up to the Lexus about six miles from the checkpoint, and the Lexus had only traveled six miles in approximately fifteen minutes despite the posted speed limit of sixty-five miles per hour, the Lexus must have been traveling at a slow rate of speed.

Although deceleration can be a factor in the reasonable suspicion analysis, the Court notes that it is not exclusively relying on this factor.  In United States v. Hernandez-Mandujano, the Fifth Circuit held that the defendant's deceleration upon passing the border patrol agents was unpersuasive and due little weight because this is a reaction of a cautious driver.  721 F.3d 345, 350 (5th Cir. 2013) (citing United States v. Samaguey, 180 F.3d 195, 198–99 (5th Cir. 1999)).  However, Hernandez-Mandujano noted that "driving below the speed limit may, combined with other circumstances, contribute to reasonable suspicion."  Id.; Villalobos, 161 F.3d at 289–92 (holding that deceleration "may be one factor contributing to the reasonable suspicion justifying a stop such as this one," when Villalobos was stopped fifty-nine miles north of the Mexican border after 2:20 a.m. on a route known for alien and drug trafficking).  Combined with the other circumstances, the Court finds the Lexus' slow rate of speed to be a factor in finding reasonable suspicion to stop the vehicle, but the Court considers this factor

16

alongside the other <u>Brignoni-Ponce</u> factors, including the known characteristics of Highway 131 as a route for smuggling aliens, its close proximity to the border, the unusual route the vehicle was traveling, the experience of knowledge of the agents that smuggling vehicles often ride in tandem with a lookout vehicle, and the unusual fact that both vehicles entering the checkpoint one after the other indicated they were travelling from and to the same locations.

Considering all the factors, the agents logically interpreted the Lexus's slow speed as waiting for the Chevrolet truck the agents had discovered at the checkpoint. The Court agrees that the odds that two vehicles, bound for Uvalde, would coincidentally leave Eagle Pass at the same time with essentially the same reason for travel, independently opt to take a substantially longer route to their destination, and choose a route that incidentally bypassed a known Border Patrol checkpoint are, as the Government argues, "exceptionally slim." Accordingly, the Lexus' slow rate of speed was logically a factor in concluding that the vehicles were riding together.

7.    <u>Appearance of the Vehicle</u>

The Court notes that a Lexus sedan that is registered in New Braunfels does not fit the usual description of the vehicles that normally travel on Highway 131, which, according to both Agents Sullivan and Kuykendall, consists of local residents, ranchers, and laborers.  Additionally, a Lexus is not typically the type of

17

vehicle utilized to perform construction work, though the occupants of the vehicle alleged it was the purpose of their trip.

      8.    Number, Appearance, and Behavior of Passengers

      Both Agents testified that the clothes the occupants of the Lexus were wearing stood out to them as suspicious. Agent Kuykendall testified that the occupants were not wearing clothing consistent with performing construction work, as they alleged was the purpose of their trip to Uvalde, but were instead wearing street clothes. Agent Sullivan testified to the same, describing that the Defendant and other occupants of the Lexus were wearing jeans, t-shirts, and tennis shoes. Such attire was consistent with neither their assertion that they were going to perform construction work on a house in Uvalde, nor consistent with the clothes worn by those who work on ranches in the area and travel on Highway 131, who Agent Sullivan testified generally wear boots and typical construction clothing.

      In Chavez-Chavez, the Fifth Circuit concluded that the "dirty and disheveled" appearance and behavior of the passengers was suspicious when coupled with the fact that the stop occurred early in the morning, decreasing the likelihood that they were returning from a day of outdoor labor. Chavez-Chavez, 205 F.3d at 149–50. Similarly, the passengers' street clothes in the instant case, when coupled with their story that the purpose of their trip was to perform

construction work, is indeed a factor to be considered in determining the agents'
reasonable suspicion.

In conclusion, the Border Patrol agents identified "specific articulable
facts, together with rational inferences from those facts, that reasonably
warrant[ed] suspicion that the vehicle's occupant [was] engaged in criminal
activity." Brignoni-Ponce, 422 U.S. at 884.  The agents rationally inferred that the
Lexus Defendant was riding in was traveling in tandem with the Chevrolet truck
carrying illegal aliens when the occupants of both vehicles asserted they were
travelling from Eagle Pass to Uvalde, on a substantially longer route on a highway
known for smuggling that avoids the permanent Border Patrol checkpoints, and
that, in the agents' experience in the area as Border Patrol agents, is typically
traveled by locals and ranchers.  Upon approaching the vehicle, Agent Sullivan
noticed it did not take a turnoff on a road that would typically be taken if traveling
to Uvalde as the occupants stated.  Further, the Lexus was traveling at an
exceptionally slow rate of speed, which further corroborated the agent's belief that
it was traveling with the Chevrolet that it entered the checkpoint with and was
waiting for the truck. These factors culminated in the agents' reasonable suspicion,
and thus the agents' stop of the vehicle complied with the Fourth Amendment.

II.    <u>No Violation of Right to Counsel</u>

        In his Supplement to his Motion to Suppress, Defendant now argues that the incriminating statements he gave to agents should be suppressed "because agents violated his Sixth Amendment right to counsel when they continued to question him after he requested an attorney."  (Dkt. # 73.)

        Defendant asserts that following his arrest, HSI Special agent Tony Diaz and Task Force Officer Orlando Vara read Defendant his <u>Miranda</u> rights. Defendant signed a waiver of those rights, and was questioned by Agent Diaz and Officer Vara.  Defendant asserts that during this questioning he requested counsel twice, yet Agent Diaz and Officer Vara continued to question him.

        Certain procedural safeguards are given to a defendant in custodial interrogation.  <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966).  "Custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  <u>Id.</u>  Statements stemming from custodial interrogation of a defendant may not be used in his prosecution unless it is demonstrated that certain procedural safeguards were used effectively to secure the privilege against self-incrimination.  <u>Id.</u>  These procedural safeguards require that:

> Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.

20

Id.

A defendant "may waive effectuation of these rights, provided that the waiver is made voluntarily, knowingly and intelligently." Id. However, even after a waiver of these rights, if a defendant "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." Id. at 444–45. Thus, even after Miranda warnings have been given, [i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present." Id. at 473–74. If a request for counsel is made, and "such a request is disregarded and the questioning proceeds, any statement taken thereafter cannot be a result of waiver but must be presumed a product of compulsion, subtle or otherwise." United States v. Priest, 409 F.2d 491, 493 (5th Cir. 1969).

In Edwards v. Arizona, the Supreme Court held that the use of a defendant's confession against him violated his rights under the Fifth and Fourteenth Amendments when, even after he was informed of his Miranda rights and waived them, a confession was obtained after the defendant had requested counsel. 451 U.S. 477, 480 (1981). The defendant in Edwards stated that he understood his rights and was willing to submit to questioning. Id. at 479. However, during the interrogation, the defendant indicated that he wanted an attorney "before making a deal." Id. The questioning ceased, and the defendant

21

was taken to county jail.  Id.  The next morning, however, detectives arrived to see the defendant and re-informed him of his Miranda rights.  Id.  The defendant indicated he was willing to talk and then implicated himself in the crime.  Id.  The Supreme Court held that because the officers subsequently questioned the defendant after he had invoked his right to counsel, the defendant's rights under the Fifth and Fourteenth Amendment[9] to have counsel present during custodial interrogation were violated, and thus his statements could not be used against him. Id. at 482.

At the hearing, Special Agent Diez testified to the following: He had received information regarding a possible load of illegal aliens in the Bracketville area and went to the Bracketville Station to interview Defendant.  Special Agent Vara sat in on the interview with him, and the interview was conducted in a small administrative office at the station.  Diez testified that Defendant had not been restrained, and although Diez had he weapon holstered on his hip, he had not deployed his weapon at any time during the interview.

---

[9] Defense counsel argues that the Defendant's Sixth Amendment right to counsel was violated.  However, the Supreme Court has determined that the rights violated in a scenario where a defendant requests counsel during custodial interrogation after given his Miranda rights are the rights under the Fifth and Fourteenth Amendments.  See Edwards, 451 U.S. at 482; see also McNeil v. Wisconsin, 501 U.S. 171, 175 (1991) (holding Sixth Amendment right to counsel does not attach until after initiation of adversary judicial proceedings).  In any event, under the Fifth Amendment, the statements given after request for counsel should be suppressed if Defendant indeed requested counsel yet the interrogation continued.

After briefly talking with Defendant about football, Diez presented him with a personal history sheet to provide biographical information.  Then, Diez read Defendant his <u>Miranda</u> rights (which included the right to counsel) and asked Defendant if he understood those rights, to which Defendant affirmed he understood and signed a paper indicating his understanding.  Defendant then signed a second time, indicating he waived those rights and felt free to speak.  The Government introduced as an exhibit the sheet with two signatures from Defendant—one indicating he understood his rights, and one indicating he waived those rights.  Diez testified that he did not discuss the facts of the case or give any information about the alleged offense prior to Defendant's waiver of his rights.  After waiving his rights, Diez testified that Defendant provided a confession to his involvement in smuggling illegal aliens.

Further, Diez testified that the entire interview was in English, that Defendant spoke fluent English, and that there were no communication problems whatsoever.  Diez stated the entire interview lasted approximately forty-five minutes to one hour.  During the entire interview, Defendant never requested a lawyer, indicated he no longer wanted to talk, or told the agents he wanted legal counsel before proceeding with the interview.

Special Agent Vara testified that Diez called him to assist Diez in interviewing Defendant at the Bracketville Station.  The interview was conducted

in a small, administrative office and at no point during the interview did Vara

exhibit his weapon.  Vara stated that Diez had conducted the interview and began

by talking with Defendant about football for approximately ten minutes.  Vara

testified that Defendant had understood and had waived his rights, and Vara

verified the Government's exhibit demonstrating the Defendant's signatures that he

understood and waived his rights.  Neither he nor Diez discussed the facts of the

case prior to Defendant's waiver of his rights and, after Defendant's waiver,

Defendant gave a full confession.  Vara stated the entire interview had lasted

approximately one hour, and at no point did Defendant ask for an attorney or

indicate that he wanted the advice of counsel.

Defendant testified that as soon as he sat down in the interview room

the agents started asking him about the situation at the checkpoint.  The agents

continued to ask him about it, and then presented him with a sheet to sign.  He told

the agents he did not want to sign and he wanted a lawyer, but the agents kept

asking him about the immigrants.  Although Defendant told the agents he did not

know anything, Diez continued to push the sheet back to him to sign.  At first

Defendant would not sign, but because the agents continued to ask him about the

situation with the immigrants, he went ahead and signed it.  Defendant testified

that he requested a lawyer after signing the waiver as well.  Further, Defendant

testified that at no point during the approximately forty-five minute interview did

24

he confess to participating in the smuggling of illegal aliens.

The Count finds the testimony of the Government's witnesses highly credible.  Both agents testified that prior to discussing the facts of the case, Defendant was read his <u>Miranda</u> rights and he understood them and waived them. To support this assertion, the Government introduced as an exhibit the Defendant's signatures in which he indicated that he understood his rights and he waived them. Defendant conceded that the signatures were his own.

Defendant asserts that even though he requested counsel he signed the waiver because the agents continued to ask him about the incident involving illegal aliens, essentially arguing that he was coerced into signing the paper indicating he understood and waived his rights, including the right to counsel.  It is true that a valid waiver of rights "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception."  <u>United States v. Cardenas</u>, 410 F.3d 287, 283 (5th Cir. 2005) (citing <u>United States v. Andrews</u>, 22 F.3d 1328, 1337 (5th Cir. 1994)).  The determination of whether a waiver is voluntary is "made on a case-by-case basis and is viewed under the totality of the circumstances surrounding the interrogation."  <u>Id.</u> (citing <u>United States v. Reynolds</u>, 367 F.3d 294, 298 (5th Cir. 2004)).

Here, the entire interview lasted only approximately forty-five minutes to one hour from start to finish.  Courts have generally held that

confessions after short periods of time do not evidence coercion.  See, e.g., United States v. LeBrun, 363 F.3d 715, 726 (8th Cir. 2004) ("We place substantial weight on the fact that LeBrun confessed after a mere thirty-three minutes.  Thus, this is not a situation where the officers wore down a defendant's will with persistent questioning over a considerable length of time.").  Defendant was not restrained during the interview, and the agents did not exhibit their weapons at any point during the interview.  Given the totality of the circumstances surrounding the interrogation, the Court finds no evidence of coercion that would indicate Defendant's waiver of rights was involuntary.

One of the Court's most important functions in a hearing of this nature is to evaluate the credibility of witnesses.  The Court has done so here.

After assessing the demeanor of the several witnesses the Court has found the agents' testimony credible and the Defendant's testimony to lack credibility.  The manner of the Defendant's testimony, as well as his testimony as contrasted with that of the agents and the exhibits, leads the Court to the conclusion the agents were telling the truth and the Defendant was not.

CONCLUSION

Based on the aforementioned reasons, this Court **DENIES** Defendant's

Motion to Suppress.

IT IS SO ORDERED.

DATED: Del Rio, Texas, February 3, 2014.

_____

David Alan Ezra
Senior United States Distict Judge